Opinion issued October 15, 2020



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-19-00234-CR

————————————

**FRANK ENNS, JR., Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

On Appeal from the 506th District Court
Waller County, Texas
Trial Court Case No. 17-02-15918

# O P I N I O N

A jury convicted appellant, Frank Enns, Jr., of possession with intent to deliver methamphetamine in the amount of 400 grams or more, and the trial court assessed punishment at 18 years' confinement. In two issues, appellant contends that

the trial court (1) abused its discretion by denying his motion to suppress; and (2) erred in refusing to give an instruction on the defense of necessity.

We affirm.

## Background

*The Surveillance*

Captain R. Garrett, an officer with the Waller County Sheriff's Office with over 29 years of experience in narcotics, testified that on August 31, 2016, he received a request to assist in a multi-agency narcotics investigation underway near Pattison, Texas. The agencies involved with this task force included the Houston Police Department Narcotics Division, the Harris County Sherriff's Office Narcotics Division, the Texas Department of Public Safety, and the Drug Enforcement Administration. Captain Garrett met with task force agents conducting this investigation and learned that, based on information provided by a confidential informant, they were tracking a large shipment of methamphetamine coming from Mexico and believed to be bound for Miami and Chicago. Based on the informant's information, the task force believed that the shipment had been delivered to a house thought to be a drug distribution point in Waller County and was awaiting further transportation out of the county. The agents asked Garrett for assistance in surveilling the residence and in conducting a traffic stop. The task force deployed a

helicopter unit to monitor the residence they believed had received the shipment of methamphetamine.

The helicopter surveillance unit observed the suspected residence, later identified by appellant to be a residence belonging to "Tivo," an acquaintance of appellant's, for several hours. The residence was located on a main road with only two ways out to the highway. During this time, officers from the helicopter unit provided Captain Garrett and other task force members with a description of the property—"a single wide trailer house, running from north to south and sitting behind it about 20 yards there's a tin shed that has a car partially backed up to it." The helicopter unit also provided a description of a vehicle at the property: a white Crown Victoria with tinted windows. The helicopter unit saw two Hispanic males repeatedly moving about the property, entering and leaving the house, as well the shed on the property. Captain Garrett also testified that the helicopter unit saw the two males periodically leave the residence and engage in four or five practice or "heat" runs in the Crown Victoria in an apparent attempt to determine if they were being followed.

The helicopter unit then reported to the task force that the two men had loaded packages into the trunk of the Crown Victoria, left the property, shut the gate, and headed onto the highway. Captain Garrett relayed this information to his local officers, including Waller County Sheriff's Office Deputy B. Mace, who he had

previously positioned on one of the only two ways from the property to the highway. Captain Garrett also informed his officers to be on the lookout for a white Crown Victoria with dark tinted windows, with two Hispanic males inside, possibly transporting narcotics.

*The Stop*

Deputies Mace and R. Horton were in one of the units positioned to intercept the suspected vehicle. Deputy Mace testified that he saw a white Crown Victoria with tinted windows that matched the provided description and that he began following the car. Deputy Mace testified that he accelerated slightly, to approximately 65-70 miles per hour, to catch up to the Crown Victoria so that he could run the license plate. As Deputy Mace approached the Crown Victoria, and while he was still 10-15 car-lengths behind, it crossed over the "fog line" and onto the right shoulder of the road. Believing the car crossed onto the shoulder without apparent cause or reason, Deputy Mace then activated his lights and initiated a traffic stop.

After the stop, Deputy Mace exited his patrol car, approached the Crown Victoria, and asked the driver to step out. After speaking with the driver, Deputy Mace learned there was another person in the car that he had not previously seen because of the car's dark window tint. Deputy Mace informed the two suspects that he had pulled them over for driving on the shoulder of the road. Deputy Mace asked

4

the suspects various questions about where they were going, whether they possessed weapons, or if they had other contraband.

Deputy Mace identified the driver of the Crown Victoria as appellant. Deputy Mace noticed that appellant had a "[s]urprised, nervous demeanor." Soon after exiting the Crown Victoria, appellant and the other suspect began conversing in Spanish, though Deputy Mace could not understand what they were saying. To prevent them from conversing any further in Spanish, Deputy Mace separated appellant from the other suspect.

*The Search of the Vehicle*

As part of his investigation, Deputy Mace requested consent to search the Crown Victoria, which appellant granted. Deputies Mace and Horton searched the trunk, and in a hidden compartment behind the lining of the trunk, found a large amount of narcotics. At this point, Deputy Mace arrested appellant and took him into custody. Appellant did not make any statements to the deputies that he was scared, coerced, or afraid for his life. The deputies did not find a weapon on appellant, on the passenger, or in the car.

The suspected narcotics were then transported to the Sheriff's Office to be tested. The test result was positive for the presence of methamphetamine and at an aggregate weight of 2,423.84 grams.

5

*Motion to Suppress*

Before trial, appellant moved to suppress the evidence obtained from the search of the car, arguing that Deputy Mace lacked reasonable suspicion to stop appellant's car. Specifically, appellant argued that he did not commit any traffic infractions that justified the stop, nor did the tip from a confidential informant provide the requisite reasonable suspicion for the stop. After hearing testimony from Deputy Mace and Captain Garrett related to the surveillance and the subsequent stop, the trial court denied the motion and made the following findings on the record:

> THE COURT: Well, one of the things that I'm instructed to do through case law and, frankly, the statutes and Court of Criminal Appeals, too, is look at the totality of the situation. And I do find that the information from the surveillance team to Captain Garrett was reasonable as it came from officers familiar to Captain Garrett and known to be reliable.
>
> I also find that the instructions from a supervising officer, in this case it was then Lieutenant Garrett, now Captain Garrett, to Corporal Mace was reasonable. Those instructions are passed all of the time, used in normal police procedures.
>
> I do find that the information provided was sufficient to alert an officer to be observant. And I do find that the defendant's vehicle did violate a section of the Transportation Code by driving on the shoulder. And I find that the stop was, therefore, justified.
>
> And, therefore, from the totality of the circumstances, the Court does find the stop being justified with the description previously given and it supports the officer's reasonable suspicion of criminal activity, your motion to suppress is denied.

*Appellant's Trial Testimony*

At trial, appellant testified in his own defense. He testified that, on August 31, 2016, he worked a full day as a mechanic and came home about 2:30 in the afternoon. After he arrived home, a man named Javier Bartiga Rodriguez, known to appellant as Tivo, knocked on appellant's door. Appellant knew Tivo because he had done some side jobs for Tivo, including working on Tivo's various cars. Tivo asked appellant for a ride to the outlet mall, but once they were in appellant's car, Tivo said he needed to stop by his house to change.

When they arrived at Tivo's house, Tivo took appellant to a shed where he revealed several large packages that appellant recognized were narcotics. Tivo pulled out a gun and informed appellant that he would drive him and the drugs to wherever Tivo directed. Appellant testified that he felt threatened because Tivo had "plenty of places to bury me." At the same time, appellant testified he began receiving texts from his family asking about his whereabouts, but appellant refused to answer them for fear it would put his family at risk. After the car was loaded, they left and appellant began driving while Tivo told him where to go. Not long after leaving Tivo's residence, appellant was stopped by Deputy Mace.

## Motion to Suppress

In his first issue, appellant argues that the trial court abused its discretion by denying his motion to suppress evidence from the traffic stop. Appellant argues that

7

the evidence presented at the hearing on the motion to suppress demonstrated that he did not commit any traffic infraction to justify the stop. Moreover, the surveillance and the uncorroborated tip from a confidential informant did not provide the reasonable suspicion necessary to stop his car. Therefore, appellant argues that Deputy Mace lacked reasonable suspicion to stop appellant and any subsequent evidence from the stop, including from the consensual search, should have been excluded.

## A.    Standard of Review

"A trial court's ruling on a motion to suppress is reviewed on appeal for abuse of discretion." *Crain v. State*, 315 S.W.3d 43, 48 (Tex. Crim. App. 2010). A trial court's ruling should be reversed only if it is arbitrary, unreasonable, or "outside the zone of reasonable disagreement." *State v. Story*, 445 S.W.3d 729, 732 (Tex. Crim. App. 2014). In a motion to suppress hearing, the trial court is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony. *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000). Accordingly, the judge may believe or disbelieve all or any part of a witness's testimony even if that testimony is not controverted. *Id.* This is so because it is the trial court that observes firsthand the demeanor and appearance of a witness, as opposed to an appellate court, which can only read an impersonal record. *Id.* Although we generally limit our review to evidence introduced at the suppression hearing, when

8

the parties consensually relitigate the issue at trial, we also consider relevant trial testimony. *Gambini v. State*, No. 01-12-00395-CR, 2013 WL 4680380, at \*4 (Tex. App.—Houston [1st Dist.] Aug. 29, 2013, pet. ref'd) (mem. op., not designated for publication).

When the trial court fails to make explicit findings of fact, we view the evidence in the light most favorable to the trial court's ruling and assume that the trial court made implicit findings of fact that support its ruling so long as those findings are supported by the record. *Id.* We will sustain the trial court's decision if we conclude that the decision is correct under any applicable theory of law. *Arguellez v. State*, 409 S.W.3d 657, 662–63 (Tex. Crim. App. 2013). We use a bifurcated standard of review to evaluate whether the totality of circumstances is sufficient to support an officer's reasonable suspicion of criminal activity. *See Abney v. State*, 394 S.W.3d 542, 547 (Tex. Crim. App. 2013). First, we "give 'almost total deference to the trial court's determination of the historical facts that the record supports,' and second, we review de novo the trial court's application of the law to facts, which do not turn on credibility and demeanor." *Id.* (quoting *Amador v. State*, 275 S.W.3d 872, 878 (Tex. Crim. App. 2009)). Further, "we review de novo whether the totality of circumstances is sufficient to support an officer's reasonable suspicion of criminal activity." *Crain*, 315 S.W.3d at 49.

## B.    Applicable Law

The United States and Texas Constitutions protect against unreasonable searches and seizures. U.S. CONST. amend. IV.; TEX. CONST. art I, § 9. No evidence obtained in violation of the Constitution or the State of Texas can be admitted as evidence against the accused at trial. TEX. CODE CRIM. PROC. art. 38.23(a). Generally, a law enforcement officer must have a warrant based on probable cause to search or seize an individual. *Wright v. State*, 7 S.W.3d 148, 150 (Tex. Crim. App. 1999). However, a police officer without a warrant may detain a person briefly if he has a reasonable suspicion that the person has or is breaking the law. *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984); *Derichsweiler v. State*, 348 S.W.3d 906, 914 (Tex. Crim. App. 2011) ("Under the Fourth Amendment, a warrantless detention of the person that amounts to less than a full-blown custodial arrest must be justified by a reasonable suspicion.").

Thus, there must be a reasonable suspicion for an officer to conduct an investigative detention. *Derichsweiler*, 348 S.W.3d at 914. In determining the reasonableness of the investigative detention, we examine the totality of the circumstances. *Id.* For an officer to have a reasonable suspicion, there must be "specific and articulable facts" that justify the traffic stop from the inception. *State v. Duran*, 396 S.W.3d 563, 568–69 (Tex. Crim. App. 2013) (quoting *Terry v. Ohio*, 392 U.S. 1, 21 (1968)).

Reasonable suspicion exists if the officer has specific, articulable facts that, when combined with rational inferences from those facts, would lead him to reasonably conclude that a particular person actually is, has been, or soon will be engaged in criminal activity. *Ford v. State*, 158 S.W.3d 488, 492 (Tex. Crim. App. 2005). This is an objective standard that disregards any subjective intent of the officer making the stop and looks solely to whether an objective basis for the stop exists. *Id.*

When information alleged to support reasonable suspicion comes from an anonymous source, something more than the just the anonymous tip is required to provide the reasonable suspicion necessary to make a valid detention. *Guevara v. State*, 6 S.W.3d 759, 763 (Tex. App.—Houston [1st Dist.] 1999, pet. ref'd). Relying on information received from an informant is acceptable if the informant's statement is reasonably corroborated by other matters within the officer's knowledge. *Id.* "[C]orroboration refers to whether the police officer, in light of the circumstances, confirms enough facts to reasonably conclude that the information given to him is reliable and a temporary detention is thus justified." *Brother v. State*, 166 S.W.3d 255, 259 n.5 (Tex. Crim. App. 2005). There is an inverse relationship between the reliability of the informant and the amount of corroboration needed to justify the stop—the less reliable the tip, the more corroborating information is needed. *Martinez v. State*, 348 S.W.3d 919, 923 (Tex. Crim. App. 2011).

11

Moreover, the detaining officer need not be personally aware of every fact that objectively supports a reasonable suspicion to detain; rather, "the cumulative information known to the cooperating officers at the time of the stop is to be considered in determining whether reasonable suspicion exists." *Derichsweiler*, 348 S.W.3d at 914 (quoting *Hoag v. State*, 728 S.W.2d 375, 380 (Tex. Crim. App. 1987)). "The factual basis for stopping a vehicle need not arise from the officer's personal observation, but may be supplied by information acquired from another person." *Brother*, 166 S.W.3d at 257.

Finally, when considering whether a traffic offense gives rise to reasonable suspicion to support an investigative stop, there is no requirement that a particular statute actually be violated. *See Gajewski v. State*, 944 S.W.2d 450, 452 (Tex. App.—Houston [14th Dist.] 1997, no pet.); *Lockett v. State*, No. 01-08-00225-CR, 2009 WL 40234, at *3 (Tex. App.—Houston [1st Dist.] Jan. 8, 2009, no pet.) (mem. op., not designated for publication); s*ee also Garcia v. State*, 43 S.W.3d 527, 531 (Tex. Crim. App. 2001) (agreeing that State "need not establish with absolute certainty that a crime has occurred to show reasonable suspicion"). Rather, an officer need have only a reasonable basis for suspecting that a person has committed a traffic offense to initiate a legal traffic stop. *See Gajewski*, 944 S.W.2d at 452.

**C.    Analysis**

Appellant first contends that the tip from the confidential informant received by the narcotics task force could not have been the basis for reasonable suspicion to stop appellant's car because Captain Garrett "could give no indicia of reliability with respect to the confidential informant." Without more, he contends, the State may not rely on this confidential informant to provide the basis for reasonable suspicion to stop and the trial court erred in denying his motion to suppress. Appellant further argues that Deputy Mace could not describe an actual traffic violation and, therefore, was unable to articulate any specific facts on which he could have formed the reasonable suspicion for the stop.

In this case, we must determine, considering the totality of the circumstances, whether the record supports the trial court's conclusion that Deputy Mace had reasonable suspicion to stop appellant's car. We first note that the record here shows that Deputy Mace did not stop appellant's car solely based on the informant's tip. The informant told members of the narcotics task force that the residence in question was a narcotics distribution house, where narcotics brought in from Mexico were stored awaiting further distribution to Miami and Chicago. The informant's information was verified when, as a result of that information, the task force (consisting of officers from various agencies) set up surveillance of the residence, which continued for several hours. During the surveillance, task force members in

13

the helicopter unit saw two Hispanic males repeatedly moving about the property, entering and leaving the house and shed on the property; engaging in four or five practice or "heat" runs in a white Crown Victoria with dark tinted windows, in what appeared to be an attempt to determine if they were being followed; and finally loading packages of what appeared to be narcotics from the shed into the trunk of the Crown Victoria, leaving the property, and heading toward the highway. The helicopter unit conveyed this information to Captain Garrett, who in turn told Deputy Mace to be on the lookout for a white Crown Victoria with dark tinted windows, driven by two Hispanic males, that was possibly transporting narcotics. Deputy Mace, who was positioned at one of the only two ways from the property to the highway, saw a white Crown Victoria with dark tinted windows, driven by appellant, pass him and he proceeded to stop the car.

The information from the confidential informant was thus independently corroborated by firsthand surveillance of appellant's activities by law enforcement. This Court has previously rejected an argument similar to appellant's (*i.e.*, that a tip from a confidential information alone is not enough without evidence that the informant was credible and reliable) and held that firsthand surveillance by law enforcement that corroborates information from a confidential informant is sufficient to provide probable cause for an arrest. *See Minassian v. State*, 490 S.W.3d 629, 638 (Tex. App.—Houston [1st Dist.] 2016, no pet.).

Here, Deputy Mace conducted an investigatory stop, which is a lesser intrusion on privacy than a "full-blown custodial arrest" and requires only that the officer have reasonable suspicion for the stop, not probable cause as was found in *Minassian. See Derichsweiler*, 348 S.W.3d at 914. We conclude that the activities of appellant articulated above that were observed by the narcotics task force and communicated to Captain Garrett sufficiently corroborated the information provided by the informant and provided Deputy Mace with reasonable suspicion to stop appellant's car to investigate possible narcotics trafficking. *See Cuero v. State*, 845 S.W.2d 387, 392–93 (Tex. App.—Houston [1st Dist.] 1992, pet. ref'd) (holding that information obtained by police officer from first-time informant that defendant had received large cocaine shipment, coupled with officer's observations of defendant, including observing defendant engage in "heat runs" and load large box into trunk of car, and officer's experience as narcotics officer gave him reasonable suspicion of criminal activity sufficient to justify investigative detention of defendant).

We further conclude that neither Captain Garrett nor Deputy Mace were required to personally observe the suspected car or appellant's activity at the residence during the surveillance in order to justify the stop. The Court of Criminal Appeals has held that the "cumulative information known to the cooperating officers at the time of the stop is to be considered in determining whether reasonable suspicion exists." *Derichsweiler*, 348 S.W.3d at 914; *Hoag*, 728 S.W.2d at 380.

For example, in *Hoag*, the Court held that a stop based on the collective knowledge of police officers who were involved in an investigation into a burglary that occurred two days before the defendant was arrested, combined with the knowledge of other officers involved in the subsequent surveillance of defendant, who observed the defendant entering backyard of one house and trying to open garage door of another house, provided officers with reasonable suspicion that crime had been committed so as to justify a brief investigatory detention. 728 S.W.2d at 377–78, 80; *see also Derichsweiler*, 348 S.W.3d at 917 (holding police officer had reasonable suspicion to detain defendant based on "information known collectively to the police," which included 911 dispatcher, even though officer who stopped defendant only received information from dispatcher about suspicious vehicle, because citizen informants told dispatcher that defendant was stopping next to vehicles in parking lots and staring at occupants of those vehicles); *cf. Armendariz v. State*, 123 S.W.3d 401, 404 (Tex. Crim. App. 2003) (holding facts observed by undercover officer and transmitted by radio to deputy sheriff with instruction to stop defendant's vehicle provided deputy sheriff with probable cause for stop of defendant's vehicle and did not violate Fourth Amendment). Therefore, the fact that neither Captain Garrett nor Deputy Mace personally observed the facts giving rise to reasonable suspicion does not run afoul of the Fourth Amendment because the stop was based on the cumulative information known to the cooperating officers,

16

including members of the task force conducting the surveillance in the helicopter unit, at the time of the stop. *Derichsweiler*, 348 S.W.3d at 917; *Hoag*, 728 S.W.2d at 380.

Finally, when Deputy Mace saw appellant driving onto the improved shoulder, Deputy Mace may have reasonably suspected that appellant had committed a traffic violation in Mace's view.[1] Deputy Mace testified that as he approached appellant's car, but while still 10-15 car lengths behind appellant, appellant "immediately moved to the right of the fog line onto the shoulder." Deputy Mace testified that although the Transportation Code allows for driving on the shoulder in some circumstances, it may only be done if necessary and safe to do so. Deputy Mace agreed that one of the permissible reasons to drive on the shoulder is to allow another car traveling faster to pass; however, in this situation, it was not

---

[1]     Section 545.058(a) of the Transportation Code provides:

(a) An operator may drive on an improved shoulder to the right of the main traveled portion of a roadway if that operation is necessary and may be done safely, but only:
          (1) to stop, stand, or park;
          (2) to accelerate before entering the main traveled lane of traffic;
          (3) to decelerate before making a right turn;
          (4) to pass another vehicle that is slowing or stopped on the main traveled portion of the highway, disabled, or preparing to make a left turn;
          (5) to allow another vehicle traveling faster to pass;
          (6) as permitted or required by an official traffic-control device; or
          (7) to avoid a collision.

TEX. TRANSP. CODE § 545.058(a).

necessary for appellant to drive on the shoulder because Deputy Mace gave no indication that he was going to pass, either by putting his blinkers on or driving up close to appellant's car. Deputy Mace also testified that he did not tailgate appellant or move his car to the left to indicate he wanted to pass. Finally, Deputy Mace testified that he believed appellant crossed onto the shoulder without apparent cause or reason in violation of the Transportation Code and, therefore, he believed he had reasonable suspicion to stop appellant's car for an investigation.

Though appellant argued below and now on appeal that Deputy Mace was traveling faster than appellant and, therefore, appellant did not violate the Transportation Code by driving on the shoulder to allow Deputy Mace to pass, the State was only obligated to show sufficient facts to create a reasonable suspicion that a crime had taken place; it was not required to prove that a crime (or here, a violation of the Transportation Code) actually occurred. *See Garcia*, 43 S.W.3d at 531; *Gajewski*, 944 S.W.2d at 452.

Further, in light of the information he received from Captain Garrett related to possible narcotics trafficking, Deputy Mace could have suspected that driving on the shoulder was not done for a permissible purpose, but rather was an indicator that appellant was engaged in illegal drug activities. *See Jolivette v. State*, No. 01-13-00451-CR, 2014 WL 3002081, at *6 (Tex. App.—Houston [1st Dist.] July 1, 2014, pet. ref'd) (mem. op., not designated for publication) (holding, based

18

on totality of circumstances, including officers' narcotics-related experience, defendant's location in high narcotics-trafficking area, and defendant's arguable violations of Transportation Code, that officers had reasonable suspicion to conduct investigation into whether defendant was engaged in illegal drug activities); *Escamilla v. State*, No. 01-06-00299-CR, 2007 WL 1440228, at *5 (Tex. App.—Houston [1st Dist.] May 17, 2007, pet. ref'd) (mem. op., not designated for publication) (holding, in light of totality of circumstances, including police officers' observations of defendant driving around neighborhood, making contact with pedestrians, shining high beams into surveillance vehicles, and then speeding through neighborhood at high rate of speed, that officers possessed articulable facts to reasonably suspect that appellant was engaged in illegal drug activities, as alleged by anonymous tipster).

Therefore, based on the information he received from Captain Garrett related to appellant's involvement in possible narcotics trafficking, combined with his observations of appellant driving on the shoulder, we conclude that Deputy Mace possessed specific, articulable facts that appellant was engaged in illegal drug activities, even if his testimony did not definitely prove that a violation of the Transportation Code occurred.

After reviewing the totality of the circumstances, we hold that the trial court did not abuse its discretion in finding that there was reasonable suspicion to stop

19

appellant's car, based on the surveillance and information relayed to Captain Garrett, as well as Deputy Mace's observation of an arguable violation of the Transportation Code, and thus denying appellant's motion to suppress. *See Derichsweiler*, 348 S.W.3d at 917 (focus must be on the totality of the circumstances "viewed objectively and in the aggregate"); *see also Oringderff v. State*, 528 S.W.3d 582, 588–89 (Tex. App.—Texarkana 2017, no pet.) (holding, based on totality of the circumstances, that officer had reasonable suspicion for stop in light of anonymous tip and officer's observation of arguable traffic violation); *Jolivette*, 2014 WL 3002081, at *6; *Escamilla*, 2007 WL 1440228, at *5.

We overrule appellant's first issue.

## Jury Instruction on Necessity Defense

In his second issue, appellant argues that the trial court reversibly erred by denying his requested necessity instruction. In addressing appellant's argument, we first determine whether the jury charge contained error and then determine whether sufficient harm resulted to require reversal. *See Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012).

## A.    Applicable Law

A defendant is entitled to an instruction on every defensive issue raised by the evidence regardless of the strength of the evidence. *Brown v. State*, 955 S.W.2d 276, 279 (Tex. Crim. App. 1997). The necessity defense is a justification defense,

20

meaning the defense justified conduct that would otherwise be criminal. TEX. PENAL CODE § 9.22; *Young v. State*, 991 S.W.2d 835, 839 (Tex. Crim. App. 1999). "When the necessity defense applies, it justifies the defendant's conduct in violating the literal language of the criminal law and so the defendant is not guilty of the crime in question." *Young*, 991 S.W.2d at 839 (quoting Wayne R. LaFave and Austin W. Scott, Jr., CRIMINAL LAW § 5.4(a) (2d ed. 1986, Supp. 1993)).

The necessity defense is based on the confession-and-avoidance doctrine, which requires a defendant to admit both the act or omission and the required mental state. *Juarez v. State*, 308 S.W.3d 398, 404 (Tex. Crim. App. 2010). A defendant must admit to each element of the offense, including both the act and the requisite mental state, to claim the justification to excuse his otherwise criminal conduct. *Villa v. State*, 417 S.W.3d 455, 462 (Tex. Crim. App. 2013). When the defensive evidence merely negates the necessary culpable mental state, it will not suffice to entitle the defendant to a defensive instruction on necessity. *Shaw v. State*, 243 S.W.3d 647, 659 (Tex. Crim. App. 2007).

Section 9.22(1) of the Penal Code provides the basic two-prong test that a defendant must satisfy to be entitled to a jury instruction on the defense of necessity. TEX. PENAL CODE § 9.22(1); *see Escobar v. State*, No. 01-14-00593-CR, 2015 WL 6550733, at *13 (Tex. App.—Houston [1st Dist.] Oct. 29, 2015, pet. ref'd) (mem. op., not designated for publication). First, a defendant is required to present evidence

21

that he reasonably believed a specific harm was imminent. TEX. PENAL CODE § 9.22(1); *Escobar*, 2015 WL 6550733, at *13. Second, a defendant must present evidence that he reasonably believed the criminal conduct was immediately necessary to avoid the imminent harm. TEX. PENAL CODE § 9.22(1); *Escobar*, 2015 WL 6550733, at *13.

## B.   Analysis

Appellant argues that the trial court erred in refusing to give an instruction on the defense of necessity because he presented some evidence of each element of the defense. But this argument focuses only on the elements of the *defense*, not the elements of the charged offense. In order to be entitled to the instruction on necessity, appellant was required to not only satisfy the elements of the *defense*, but he was also required to admit to all elements of the *offense*, including the act itself and the requisite mental state. The accused must admit to the offense because the plea of necessity addresses the accused's state of mind, requiring the accused to "reasonably believe his conduct is immediately necessary to avoid imminent harm." *Jimenez v. State*, No. 14-99-00627-CR, 2000 WL 991711, at *2 (Tex. App.—Houston [14th Dist.] July 20, 2000, no pet.) (not designated for publication). When a defendant does not admit to committing the offense or having the requisite mental state, courts have held that the defendant is not entitled to a jury instruction on the defense of necessity.

For example, in *Young v. State*, the defendant was charged with attempted murder after he was placed under a civilian's arrest. 991 S.W.2d at 836. The defendant testified at trial that he was afraid for his life after being unlawfully arrested, and that he attempted to escape by jumping out of the moving truck, hitting the steering wheel in the process and causing the truck to veer off the road. *Id.* The court acknowledged that while the defendant argued he acted reasonably and that these actions were necessary to save his life, "such an argument does not present the defense of necessity." *Id.* at 839. Instead, to raise necessity, the defendant had to "admit he committed the offense and then offer necessity as a justification." *Id.* Because the defendant did not admit to attempted murder, and instead argued he did not commit the offense because he did not have the requisite intent and did not perform the actions alleged by the State, the court held that he was not entitled to a jury instruction on the defense of necessity. *Id.*

And similar to this case, in *Jimenez v. State*, the defendant was charged with possession with intent to deliver cocaine. 2000 WL 991711, at *1. At trial, the defendant argued that he did not possess the cocaine voluntarily, but instead argued that he was ordered to load twenty packages of cocaine into two hidden compartments in a truck, or he "would not get out of the truck alive." *Id.* at *3. Significantly, the court found that the defendant was charged with possession of cocaine with intent to distribute in an amount over 400 grams, *not with* loading

23

twenty packages of cocaine into two hidden compartments. *Id.* Because the defendant did not admit that the voluntarily, knowingly, or intentionally possessed cocaine with intent to distribute in an amount over 400 grams, he did not raise the defense of necessity and the trial court properly omitted the jury instruction on necessity from the charge. *Id.*

Here, appellant was charged with possession of 400 grams of methamphetamine with intent to deliver. To raise necessity as a defense, appellant must have admitted to: (1) knowingly or intentionally, (2) possessing, (3) methamphetamine, (4) in an amount greater than 400 grams, (5) with the intent to deliver the methamphetamine. *See* TEX. HEALTH & SAFETY CODE § 481.112(e). Like the defendants in *Young* and *Jimenez*, appellant has not admitted to all the elements of the crime charged, specifically that he voluntarily, knowingly, and intentionally possessed the methamphetamine with an intent to deliver. Appellant was asked multiple times by the State during his testimony whether it was his intent to take the drugs and deliver them somewhere else. Each time he was asked, appellant said no, that was not his intention:

| STATE. | Did you intend to deliver those drugs that were found in your car and the passenger somewhere else to be delivered? |
|---|---|
| APPELLANT. | It was not my intentions. |
| STATE. | Yes or no? |
| APPELLANT. | No. |

24

STATE.          After you and Tivo were at his place, you knew there were drugs in your car?

APPELLANT.      Being put drugs in the car, I have --

STATE.          Yes or no?

APPELLANT.      Yes.

STATE.          And you knew that you were going to take those drugs somewhere else?

APPELLANT.      Correct.

STATE.          And it was your intent to take those drugs and your passenger somewhere else?

APPELLANT.      No.

*****

STATE.          Okay. So once the drugs are in the car and Tivo is in the car, where are you going?

APPELLANT.      290.

STATE.          Was it your intent, then, when you got to 290 to drop off Tivo?

APPELLANT.      It was not my intentions.

STATE.          You had no -- so your attempt is to drive around?

APPELLANT.      I'm doing what I'm being told.

*****

STATE.          So was it your intent now when the drugs are in the car and Tivo's in the car to drive Tivo and the drugs somewhere else?

APPELLANT.      May I ask something?

25

STATE.          I just need a yes or a no.

                    *****

APPELLANT.      Not my intentions.


Moreover, appellant conceded in his brief on appeal that he did not admit to all the elements of the offense because "he did not have the requisite *mens rea* because he was forced to participate in the crime at gun point." This argument attempts to *negate* an essential element of the offense—the culpable mental state—rather than *admit* to an essential element of the offense as is required to raise the defense of necessity. *See Shaw*, 243 S.W.3d at 660 (holding trial court did not err in refusing to submit instruction on necessity to jury when appellant, who was charged with intentionally, knowingly, or recklessly causing injury to child, argued at trial that she performed CPR without any conscious awareness that she might be causing some injury to child because that "defensive posture serves only to negate the culpable mental element of the offense"). Because appellant did not admit to the requisite mental state, he was not entitled to an instruction on the defense of necessity. *Young*, 991 S.W.2d at 836; *Jimenez*, 2000 WL 991711, at *1.

We overrule appellant's second issue.

26

**Conclusion**

We affirm the trial court's judgment.


Sherry Radack
Chief Justice

Panel consists of Chief Justice Radack and Justices Goodman and Hightower.

Justice Goodman, concurring.

Publish. TEX. R. APP. P. 47.2(b).